RECORD NUMBER: 14-4452

# United States Court of Appeals

### *for the*

# Fourth Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

– v. –

**BARRY BAIZE,**

*Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

# OPENING BRIEF OF APPELLANT

**WILLIAM S. TRIVETTE**
**WILLIAM S. TRIVETTE, ATTORNEY**
**AT LAW, PLLC**
**301 North Elm Street**
**Suite 308-A**
**Greensboro, NC  27401**
**(336) 441-8054**
**trivette@triad.twcbc.com**

*Counsel for Appellant*

**CP** **COUNSEL PRESS** • VA – (800) 275-0668

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

          Statement of the Facts ......................................................... 5

SUMMARY OF THE ARGUMENT ......................................................... 15

ARGUMENT............................................................................................. 16

I.  THE EVIDENCE WAS NOT SUFFICIENT TO PROVE THAT
    THE DEFENDANT POSSESSED A FIREARM ON THE
    EVENING OF DECEMBER 14, 2012............................................. 16

          Standard of Review.............................................................. 16

          Discussion ........................................................................... 16

II.  THE DISTRICT COURT, OVER DEFENDANT'S OBJECTION,
    ABUSED ITS DISCRETION BY DISMISSING A JUROR ON
    THE SECOND DAY OF A SHORT TWO-DAY TRIAL................ 18

          Standard of Review.............................................................. 18

          Discussion ........................................................................... 18

III.  THE "IN OR AFFECTING COMMERCE" ELEMENT OF AN
    18 U.S.C. § 922(g)(1) FELON IN POSSESSION CHARGE AS
    APPLIED TO THIS DEFENDANT IS UNCONSTITUTIONAL
    AS EXCEEDING CONGRESS' AUTHORITY UNDER THE
    COMMERCE CLAUSE ................................................................ 20

          Standard of Review.............................................................. 20

Discussion ...............................................................21

CONCLUSION ...................................................22

REQUEST FOR ORAL ARGUMENT ..................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

Glasser v. United States,
    315 U.S. 60 (1942)...........................................................................16

Jones v. United States,
    529 U.S. 848 (2000).........................................................................22

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.,
    65 F.3d 1113 (4th Cir. 1995)............................................................20

Oregon v. Kennedy,
    456 U.S. 667 (1982).........................................................................3

United States v. Burgos,
    94 F.3d 849 (4th Cir. 1996)...........................................................16

United States v. Gallimore,
    247 F.3d 134 (4th Cir. 2001)......................................................16, 21

United States v. Lopez,
    514 U.S. 549 (1995).........................................................................22

United States v. Morrison,
    529 U.S. 598 (2000).........................................................................22

United States v. Nathan,
    202 F.3d 230, 234 (4th Cir.), *cert. denied*, 529 U.S. 1123 (2000)......21

United States v. Nelson,
    102 F.3d 1344 (4th Cir. 1996), *cert. denied,* 520 U.S. 1203 (1997)....18

## Rules, Statutes, and Other Authorities

18 U.S.C. § 922(g)..........................................................................1, 21, 22

18 U.S.C. § 922(g)(1) ...............................................................2, 15, 20, 21, 22

iii

18 U.S.C. § 924(e) ......................................................................2, 4

18 U.S.C. § 3231 ............................................................................1

28 U.S.C. § 1291 ............................................................................1

Fed. R. App. P. 4(b)(2) ...................................................................1

Fed. R. Crim. P. 24c .....................................................................18

## JURISDICTIONAL STATEMENT

This is a direct appeal by the Defendant from his conviction following two mistrials before ultimate conviction by jury in federal court. Jurisdiction was conferred on the United States District Court by 18 U.S.C. § 3231. This appeal is from a final judgment. Appellate jurisdiction is conferred on this Court by 28 U.S.C. § 1291. Final judgment was entered on June 6, 2014. The Defendant had already filed a *pro se* notice of appeal on June 5, 2014, and by operation of Fed. R. App. P. 4(b)(2), it was deemed timely filed on January 6, 2014.

## STATEMENT OF THE ISSUES

I. Whether the evidence was sufficient to prove the Defendant guilty beyond a reasonable doubt.

II. Whether the district court, over Defendant's objection, abused its discretion by dismissing Juror 11 on the second day of a short two-day trial.

III. Whether the "in or affecting commerce" element of 18 U.S.C. § 922(g) as applied to this Defendant is unconstitutional as exceeding Congress' authority under the Commerce Clause.

1

## STATEMENT OF THE CASE

On July 29, 2013, the Appellant/Defendant (hereinafter Defendant), was charged in a single-count indictment with  knowingly possessing in commerce and affecting commerce, a firearm, that is, a Germany .22 caliber handgun, having three previous convictions for a violent felony or a serious drug offense, or both, committed on occasions different from one another, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  (J.A. 11, Indictment).  At trial, prior to jury selection, the Government moved to amend the indictment to allege that the firearm in question should be a .22 caliber Derringer instead of a Germany .22 caliber handgun.  (J.A. 26).  This issue had been resolved at a prior trial in this case.  The Defense did not object as it did not surprise the Defense nor was it a fatal variance of the charge returned by the grand jury.  (Id.).

This case had first been called for trial on October 21-22, 2013.  At this trial, the parties presented evidence and argued the case to the jury.  While the jury was in deliberations, during a lunch break two jurors approached the Government's case agent in a restaurant and had a brief conversation about matters unrelated to the trial evidence.  The Government brought the matter to the court's attention prior to the jury resuming deliberations.  The Defense moved for a mistrial, which the court granted.  (J.A. 4, Docket Entry; *see also*, J.A. 5, Docket Entry 19, Transcript of Mistrial Hearing).

2

The Defendant filed a motion to dismiss the indictment regarding the mistrial (J.A. 4, Docket Entry 16), which the Government opposed (J.A. 5, Docket Entry 22). Just prior to jury selection at the second trial, the court denied the motion to dismiss on the grounds that the mistrial had been granted at the request of the Defense and that there was no Government action to "goad" the Defendant into requesting a mistrial. *See*, Oregon v. Kennedy, 456 U.S. 667, 671 (1982).

The second full jury trial was held November 13-14, 2013. (J.A. 5-6). Both parties presented evidence and argued the case, but the jury did not reach a unanimous verdict. The Defense again requested a mistrial which was granted by the court. (J.A. 6).

The third jury trial, held January 21-22, 2014, ultimately resulted in a guilty verdict. Prior to resuming the Government's case on the second day of trial, the court informed the parties that Juror 11, Ms. M, was ill and would not be coming to court. The defense objected to substituting an alternate for Juror 11, noting that Ms. M was African-American, as was the Defendant. This would leave only one other African-American on the jury. Despite the Defendant's objection, the court ruled that the trial would continue and an alternate would be substituted. (J.A. 174-175).

Shortly after the court determined to substitute and before the evidence resumed, the court announced that Juror 11 had come to court but she was ill. The

3

court questioned her about her illness. (J.A. 178-180). Over defense objection, the court excused Juror 11 and substituted an alternate. (JA 180-182).

At the conclusion of the Government's case, the Defense moved for judgment of acquittal pursuant to Rule 29, Federal Rules of Criminal Procedure. (J.A. 256). The Defense specifically argued that the Government's evidence that the firearm had been manufactured in Germany and had been found in North Carolina was insufficient to prove an effect on commerce. The court denied the motion. (J.A. 256-257). The Defense renewed the Rule 29 motion at the conclusion of all the evidence, which the court denied. (J.A. 288).

At trial, the Government called witnesses to establish that, during a party, the Defendant had a dispute with his girlfriend and that during the commotion, he displayed a single shot .22 caliber Derringer. The police were called and a Derringer firearm was found on the ground where the Defendant had been walking. The Government played audio recordings of telephone conversations between the Defendant and his girlfriend after his detention in the local jail. The Defendant testified that he did not possess the firearm. The jury returned a verdict of guilty.

At sentencing on May 16, 2014, the Defendant was found to be subject to the Armed Career Criminal Act, 18 U.S.C. § 924(e). The court sentenced Defendant to 245 months imprisonment followed by five years of supervised release and a $100

4

special assessment.  Defendant filed a *pro se* premature notice of appeal on June 5, 2014, which was deemed filed when the Judgment was filed on June 6, 2014.

**Statement of Facts**

The Government contended that the Defendant, who stipulated to a prior felony conviction, possessed a single-shot .22 caliber Derringer at a party on the evening of December 14, 2012.  Georgina (aka, Gina) Stone testified (JA 195–223) that she had known the Defendant about 15 years and that they had begun a dating relationship around April, 2012.  On the evening of December 14, 2012, she, along with her sister (Suzette Williams) and Suzette's daughter (Jessica Davis) had driven to a friend's house for a party on Sharpe Street in Eden, NC.  The Defendant came to the same party.  Stone recalled that everyone was drinking or had done so earlier in the evening.  Stone was in the kitchen when she walked out into the hall to get some air.  The Defendant followed her and said that he wanted to talk to her outside the house.  Stone said she did not want to go out because it was cold.  The Defendant asked for her phone, which she gave him.  He bumped into a wall, Stone grabbed his arm, and the Defendant gave her a shove.  When she asked why he did that he asked her again to go outside and talk.  Stone moved closer to the door and when the Defendant opened the door it came back and hit her rather hard in the chest.  Stone's niece, Jessica Davis, saw this and moved to confront the Defendant, who by this time was walking out the

5

door of the house.  The Defendant walked out into the front yard, followed by Stone, her sister Suzette, Stone's niece Jessica Davis, and Stone's son Wayne, as well as others from inside the house.   Several people began beating the Defendant, confronting him about his pushing the door against Ms. Stone.  (J.A. 203).  Stone saw a gun in the Defendant's right hand - she tried to calm the Defendant as he was upset. The porch light was on and there were also street lights.  Outside the house, she was about two to three feet from the Defendant.  Stone knows Nose Peeler and he is small compared to the Defendant.  The Defendant returned her phone and was walking across the vacant lot next to the house as police arrived.  She saw the Defendant walk across the lot until he was stopped at the street.  Stone did not see the police find a firearm although she did talk to the police that night.  She was angry at Defendant that night because he had a gun out around her son. She later resumed the relationship with the Defendant and received telephone calls from him while he was detained at the county jail.  She identified the Defendant's voice when the Government played Exhibits 9A & 9B.  On cross examination, Ms. Stone confirmed that her sister (Suzette Williams) and her niece (Jessica Davis) were hitting the Defendant with their fists.  (J.A. 219).

The Government called Georgina Stone's sister, Suzette Williams (J.A. 60-81), and Suzette Williams' daughter, Jessica Davis (J.A. 116-123).  Both testified that they

6

were with Georgina Stone at the party on the night of December 14, 2012. Suzette Williams testified that she saw the small handgun in the Defendant's right hand, as he took it in and out of his pocket. (J.A. 66-67). Williams knew a man named Peeler but she did not see Peeler with a gun. Peeler is shorter and smaller in stature than the Defendant. (J.A. 81). Williams confirmed that as the Defendant was walking across the vacant lot, he had his back to her and that it was dark in the center of the vacant lot. (J.A. 80). Jessica Davis testified she also was at the party and she saw the Defendant push the door against her aunt, Ms. Stone. Davis pushed the Defendant outside and she saw the gun in the Defendant's hand. (J.A. 119). The police arrived and they detained the Defendant. Davis gave a statement to the police that night and another statement a few days later. Davis had never seen the Defendant with a firearm before this incident.

April Martin testified (J.A. 109-115) that she was the "dispatch" for the Eden Police Department during the incident. As the dispatch, she takes calls to the police department including 911 calls. At 10:47 p.m. on the night of December 14, 2012, she received a 911 call from a female caller who appeared to be in distress. Martin could hear the disturbance in the background; she heard someone say, "he has a gun." Martin dispatched Officers Guillen and Eads to Sharpe Street.

Mark Guillen testified (J.A. 82-108) that on the evening of December 14, 2012,

he was on routine patrol as an officer with the Eden Police Department.  He was in uniform and was driving a marked patrol car.  Around 10:40 p.m., he was dispatched to the area of Sharpe and Hairston Streets.  When he received the call he was located only a couple of blocks away so he responded in two to three minutes.  Once on the scene, there was a considerable commotion going on and he was advised by individuals there that there had been an altercation inside the residence. They pointed to the Defendant, who was about 30 yards away, and said that the Defendant had a weapon.  Guillen shined his flashlight on the suspect and another man as they were walking across a vacant lot.  Guillen ordered the men to stop and one of the men looked at him, but both kept walking.  One of them, later identified as the Defendant, was taller and heavier than the other man who was probably about 5 feet 4 inches tall. As Guillen continued to try to stop them, he saw the man later identified as the Defendant, keeping his hands to the front of his body, until he tossed a shinny object. (J.A. 87).  The officer drew his weapon and approached and continued giving commands to stop.  Eden Police Officer Eads was on the scene and both officers approached the two men.  Upon crossing the vacant lot and arriving at Hairston Street, Guillen placed the Defendant into handcuffs and searched him.  He did not find any weapon or contraband on the Defendant.  Lieutenant Harbor arrived on the scene and he found a .22 caliber Derringer on the ground. The ground had frost on it, but the

8

weapon was dry.  Guillen identified Government's Exhibit 8 as the .22 Derringer that was found on the ground on December 14, 2012.  The man walking alongside the Defendant (Mr. Peeler) was not arrested or questioned that night.  In Guillen's written statement of the events that occurred that night, he did not write that he saw the Defendant throw anything.  He also wrote in his report that he told Lt. Harbour that Baize "possibly dropped a gun in the yard." (J.A. 107).  Guillen conceded that since he had just arrived on the scene, he could not say if someone else had walked across the field.

Chester Eads testified (J.A. 245-253) that he was on routine patrol with the Eden Police Department on the night of the incident on Sharpe Street.  When he got the call from dispatch, he was about three to four blocks away.  When he and Officer Guillen arrived at Sharpe Street he saw individuals outside the house and two subjects walking toward Hairston Street.  Eads was informed by people standing outside that the man who was walking away and wearing a black jacket and blue jeans had a firearm.  As one of the men, later identified as the Defendant, was walking across the vacant lot, he had his hands in his pockets until he reached the halfway point in the lot.  He brought his hands out of his pockets, and that was about the place where Lt. Harbour later found a firearm.  The officers stopped the Defendant and Peeler on Hairston Street. The Defendant kept trying to pull away until he was placed in

handcuffs.  The officers searched the Defendant but located no firearm or contraband on his person.  Lieutenant Harbour arrived and located a firearm along the same path that the Defendant had been walking.

Lieutenant Tim Harbour testified (J.A. 128-133) that he was on duty as the A Shift Commander on the evening of December 14, 2012.  When Lt. Harbour arrived at the scene, he saw that Officers Eads and Guillen were talking with two subjects, one of whom he recognized as James Peeler.  At the request of Officer Guillen, Harbour walked the path between the suspects and the house and he located a Derringer, single-shot pistol.

Captain Perry Brookshire testified (J.A. 134-139) concerning the system that records outgoing inmate telephone calls from the Rockingham County Jail.  Inmate calls are recorded and can be searched by using the telephone number called.  Detective John Price of the Eden Police Department is authorized to search recorded calls.  The recording system was working properly on both December 15, 2012, and on January 8, 2013.  Captain Brookshire authenticated Government Exhibit 9 as a CD containing recorded telephone calls on December 15, 2012 and January 8, 2013.  When an inmate makes a call from the jail, both the caller and the person called will hear an automated warning that the call is being recorded.

John Price testified (J.A. 139-195) that he was a detective

10

with the Eden Police Department and that he had worked on the Defendant's case. Although he was not at the scene on the night in question, he subsequently took photographs, conducted interviews, and performed other investigative actions. He processed the firearm for fingerprints but found no evidence that latent prints were on the firearm. He swabbed the firearm to attempt to pick up DNA evidence and obtained a DNA sample from the Defendant. Price sent all the swabs to the SBI Lab. When Price examined the firearm there was a round in the chamber. He identified Government's Exhibit 8B as the .22 caliber round he removed from the weapon. Price took measurements at the scene and testified as to relevant distances. Ms. Stone had given him her telephone number and he was able to locate and record telephone conversations purportedly between the Defendant and Ms. Stone. Price identified Government's Exhibit 9 as the CD of two telephone calls (December 15, 2012 and January 8, 2013) made to Ms. Stone's telephone number.

Matthew Amato testified (J.A. 225-229) that he has been a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives for 13 years. He testified as an expert on the origin of firearm manufacture and interstate or foreign nexus. (J.A. 227). Amato identified Government's Exhibit 8 as a .22 caliber Derringer that was manufactured in West Germany. The words "West Germany" are stamped on the frame and there were German proofmarks present. Amato gave it as his opinion that,

11

assuming the firearm had been found in North Carolina, it had "traveled in and affected interstate and/or foreign commerce." (J.A. 229).

Paul Johnson testified (J.A. 230-234) that he is a special agent with ATF. Johnson test fired the .22 caliber Derringer in question and it functioned as a firearm.

Special Agent Jody West testified (J.A. 234-243) that he is a forensic scientist at the North Carolina State Bureau of Investigation (SBI) Lab in Raleigh. He analyzes evidence for the presence of body fluids to attempt to generate a DNA profile which can be compared to known DNA samples. He testified as an expert in forensic DNA analysis. In his lab, West had been asked to compare swabs from the pistol found in the vacant lot in this case to the swabs taken from the Defendant. However, West could not generate a DNA profile from the swabs taken from the firearm, so he could not make such a comparison. (J.A. 240). It is not uncommon that no DNA profile will be generated from a firearm. (J.A. 242).

The Government introduced a stipulation signed by all the parties that the Defendant had previously been convicted of a crime punishable by more than one year. (J.A. 245).

The Defendant, Barry Dean Baize, testified in his own defense. (J.A. 265-287) and categorically denied possessing a firearm on the evening of December 14, 2012. He is 40 years of age and has lived almost his whole life in Rockingham County,

North Carolina, which includes the town of Eden. He has three children, ages 12, 11, and ten, and on the day in question, he was single and living with his mother. Around 7 p.m. on the evening of December 14, he had attended his first of two gatherings. At the first, he had seen his girlfriend, Ms. Gina Stone, as well as her sister, Sue Williams, and Williams' daughter, Jessica Davis. He had caught a ride to this first party with Ms. Stone, although he had departed after about an hour and one-half with his cousin, Deucey. When the Defendant returned to this first party, everyone had departed for a second party at "Turkey's" house. (J.A. 267). The Defendant arrived at the second party, attended by about 25 to 30 individuals, around 9:30 p.m. It was fairly crowded in the house. At one point, he asked Ms. Stone to come into the hall so they could discuss his getting a ride home from her. He asked Gina to come outside so they could talk privately but she did not want to go outside as it was cold. The Defendant had been drinking and he felt under the influence of the drinks. As he was talking to her she was continually texting another person. She would not give him the ride and he became irritated. He snatched the phone from her and pushed the door against her. When he pushed the door against her, many people, including Sue Williams and Jessica Williams, came out of the kitchen and pushed him onto the porch. They surrounded him, asking him to fight. Her family was pushing and punching him; there was a big commotion for two to three minutes. He heard one of

13

the women say that she was calling the police.  When he heard the siren, he started to walk through the vacant lot next to Turkey's house.  Before he walked away, he still had Ms. Stone's cell phone in his hands, so he returned it to her.  As he walked away, he was accompanied by his cousin named James Peeler.  As he was walking, he heard commands to stop, but he did not stop at first.  He was nervous, it was dark, and he wanted to make it to the street where there was a light.  It was dark in the middle of the vacant lot. (J.A. 274).  He noticed that Peeler kept looking back at the officers. The Defendant testified that he had his hands in his pockets but he did not throw anything on the ground as he walked.  His hands never came out of his pockets until he reached Hairston Street.  (J.A. 274).  While they were walking, the Defendant saw Peeler "reach as to grab something."  (J.A. 275).  At Hairston Street, an officer had pointed a Taser at him and told him to take his hands out of his pocket.  He was detained and searched, but he did not have anything in his possession.  He was not questioned that night or at any other time about the incident.  He admitted that the recordings of two telephone calls that had been played in court were his conversations with Ms. Stone.  In the first recording, made in the early morning hours following his arrest, he had said that he had a firearm, but he only did that so as not to implicate Peeler.  In the second phone call he had said he was going to try to "wiggle out of the charge."  (J.A. 278).  He had made this statement while he was still in state, not

14

federal, court, and at that time, he thought that because his *Miranda* rights had not been read to him, he might have a defense.

## SUMMARY OF THE ARGUMENTS

I.  The evidence was not sufficient to prove that the Defendant possessed a firearm on the evening of December 14, 2012.  The Defendant's version of events presents a clear and credible explanation of his actions on the night in question. The event started when he pushed his girlfriend, Ms. Stone, and pinned her against the wall with the door.  This domestic dispute was immediately escalated by Ms. Stone's sister, her niece, and others attending the party.  The eye-witnesses were clearly agitated and viewed the cell phone in his hand as a firearm.  Though police recovered a small, single-shot Derringer on the ground, James Peeler was also walking with the Defendant, and the evidence does not prove that the Defendant, rather than Peeler or someone else,  was the one who possessed the gun.

II. The district court, over Defendant's objection, abused its discretion by dismissing Juror 11 on the second day of a short two-day trial.  This was only a two-day trial and Juror 11 sat through the first day.  On the second day, the juror's Mother notified the court that her daughter had been ill and could not come to court.  Despite this initial call, Juror 11 did come to court.  Upon questioning, the juror did not provide sufficient information of illness to deprive the Defendant of his right to be tried by the

15

jury selected.

    III.  The "in or affecting commerce" element of a 18 U.S.C. §§ 922(g)(1), as applied by the district court in this case, is unconstitutional as exceeding Congress' authority under the Commerce Clause.  Although the Fourth Circuit has ruled against this argument in <u>United States v. Gallimore</u>, 247 F.3d 134, 137 (4th Cir. 2001), the issue is raised to preserve it for further appeal.

<u>ARGUMENT</u>

**I.**    **THE EVIDENCE WAS NOT SUFFICIENT TO PROVE THAT THE DEFENDANT POSSESSED A FIREARM ON THE EVENING OF DECEMBER 14, 2012.**

**<u>Standard of Review</u>:**

    The Court of Appeals reviews *de novo* the sufficiency of the evidence and sustains the verdict if there is substantial evidence, taking the view most favorable to the Government, to support it. <u>United States v. Burgos</u>, 94 F.3d 849, 862 (4th Cir. 1996)(*en banc*), *citing*, <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942).

**<u>Discussion</u>:**

    Despite the burden placed upon a Defendant seeking to overturn a jury verdict, this Court should vacate this conviction and remand the case with instructions to dismiss.  The Defendant's version of events presents a clear and credible explanation of his actions on the night in question. The event started when he pushed his girlfriend,

16

Ms. Stone, and pinned her against the wall with the door.  This domestic dispute was escalated by Ms. Stone's sister, her niece, her son, and by others attending the party.  The eyewitnesses were clearly agitated and likely viewed the cell phone in his hand as a firearm.  Though police recovered a small, single-shot Derringer on the ground, James Peeler was also walking with the Defendant, and Defendant's testimony establishes that it was Peeler, not the Defendant, who likely tossed the firearm.  It was dark in the center of this vacant lot, so neither of the policemen who were on the scene could have seen what happened.

There is no physical evidence, neither fingerprint nor DNA evidence, that link this Defendant to the firearm.  No eyewitness other than the Defendant's girlfriend, her sister, and her niece, testified that they saw the gun.  Further, the evidence is clear that they were all extremely angry at the Defendant that night because he had pushed the door against Ms. Stone.  Eyewitness' testimony during a heated altercation like this case presents, is suspect and should be viewed with caution.

The Defendant had no obligation to take the witness stand, but he did so and presented logical, credible evidence that he did not possess this Derringer.  The lack of any fingerprint or DNA evidence trumps the Government's case and it does not rise to the level of proof beyond a reasonable doubt.  This Court should reverse the conviction.

17

## II.    THE DISTRICT COURT, OVER DEFENDANT'S OBJECTION, ABUSED ITS DISCRETION BY DISMISSING A JUROR ON THE SECOND DAY OF A SHORT TWO-DAY TRIAL.

**Standard of Review**:

The district court's decision to replace a juror with an alternate is reviewed for abuse of discretion. United States v. Nelson, 102 F.3d 1344, 1349 (4th Cir. 1996), *cert. denied,* 520 U.S. 1203 (1997).

**Discussion**:

Although Federal Rule of Criminal Procedure 24c gives a court authority to replace a juror who is unable to perform her duties, that authority is not without limitation. A defendant, absent adequate justification, should be tried by the jury initially selected. United States v. Nelson, 102 F.3d 1344, 1349 (4th Cir. 1996), *cert. denied,* 520 U.S. 1203 (1997). A trial judge should not interfere with the jury selected without a legally relevant reason and a factual basis for doing so. Id. A court replacing an empaneled juror with an alternate must consider reasonable alternatives. A district court that acts without adequate factual support that a juror is unable to perform her duty amounts to abuse of discretion. Id.

This was the third time that this case had proceeded to trial, and in the prior two trials, the case was finished in two days. Hence, both the Government and the court knew that after one day of testimony, there remainder of the trial would only last

18

another day.  In fact, at the conclusion of the first day, Government Counsel told the court that the Government's case should conclude before lunch the next day. (J.A. 159).

Prior to resuming the Government's case on the second day of trial, the court informed the parties that Juror 11, Ms. M, was ill and would not be coming to court. (J.A. 174).  The court stated it had two options: delay the trial to allow Juror 11 to recover and return to court; or, to excuse Juror 11 and substitute an alternate.  The defense objected to substituting an alternate for Juror 11, requesting instead that the trial be delayed so that Ms. M could return.  Counsel called the court's attention to the fact that Juror 11 was African-American, as was the Defendant.  Were she excused, it would leave only one other African-American on the jury.  Despite the Defendant's objection, the court stated that were the trial to be delayed, there would be no guarantee when Juror 11 recovers.  The court ruled that the trial would continue and an alternate would be substituted.  (J.A. 175).

Shortly after the court ruled to substitute an alternate juror and before the jury returned to hear evidence, the court announced that Juror 11 had indeed come to court but that she was ill.  (J.A. 178).  The court brought Juror 11 into court and questioned her about her illness.  She stated she felt dizzy and nauseated.  When asked if she could concentrate if she were to continue as a juror, she stated, "probably not." (J.A. 179).

19

Defense counsel objected to substituting an alternate for Juror 11, particularly because she was one of two African-Americans on the jury. Based on her actually coming to court and based on her appearance before the court, the Defense submitted she could continue. Alternatively, the trial should be delayed until she recovered. Over defense objection, the court excused Juror 11 and substituted an alternate. (JA 181).

The lower court abused its discretion by dismissing Juror 11. Juror 11 was well enough to travel to court and to appear before the judge and to answer his questions. Alternatively, the lower court abused its discretion by not delaying the trial for at least one day to determine if the juror were feeling better the following day.[1] There is no evidence in the record to demonstrate that a one day continuance would have been unduly inconvenient for the court or the government.

This Court should reverse the conviction and remand for a new trial.

III.   **THE "IN OR AFFECTING COMMERCE" ELEMENT OF AN 18 U.S.C. § 922(g)(1) FELON IN POSSESSION CHARGE AS APPLIED TO THIS DEFENDANT IS UNCONSTITUTIONAL AS EXCEEDING CONGRESS' AUTHORITY UNDER THE COMMERCE CLAUSE.**

**Standard of Review:**

The constitutionality of a federal statue is a pure question of law, subject to <u>de novo</u> review. <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.</u>, 65

---

[1] The exchange with Juror 11 occurred on January 22, 2014. This Court can take judicial notice that this was a Tuesday. Federal Rule of Evidence 201.

20

F.3d 1113, 1123 (4th Cir. 1995).

**Discussion:**

The Defendant contends that the "in or affecting commerce" element of a 18 U.S.C. §§ 922(g)(1), as interpreted and applied by the district court in this case, is unconstitutional as exceeding Congress' authority under the Commerce Clause.[2]  The Defendant acknowledges that the Fourth Circuit has ruled against this argument in United States v. Gallimore, 247 F.3d 134, 137 (4th Cir. 2001), *citing* United States v. Nathan, 202 F.3d 230, 234 (4th Cir.), *cert. denied*, 529 U.S. 1123 (2000).  However, the Defendant raises the argument to preserve it for further appeal.

Section 922(g)(1) forbids felons to "possess in or affecting commerce, any firearm or ammunition . . . ."  The evidence in this case is that the firearm was manufactured in the country of Germany.  The Defendant objected that the firearm's mere traveling across state lines or an international border was sufficient to prove an effect on commerce.  (J.A. 256-257).

Congress acquires jurisdiction over the behavior prohibited in § 922(g) through the Commerce Clause.  The district court employed a legal fiction that any past

---

[2] Although § 922(g) regulates "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," the Defendant's argument is limited to the "possess in or affecting commerce" portion of the statute.

21

interstate transportation of the firearm provides a sufficient nexus to the present possession to allow the "in or affecting commerce" element to federalize the behavior.

The Supreme Court's decisions in <u>United States v. Lopez</u>, 514 U.S. 549 (1995), <u>United States v. Morrison</u>, 529 U.S. 598 (2000), and <u>Jones v. United States</u>, 529 U.S. 848 (2000) suggest that this legal fiction is not valid. The Defendant contends that evidence of mere passing across state lines or across the border of the United States is insufficient to establish the "in or affecting commerce" element of a 18 U.S.C. §§ 922(g)(1).

CONCLUSION

For the foregoing reasons, the Defendant respectfully requests this Court reverse his conviction because the evidence is not sufficient for a reasonable jury to find him guilty beyond a reasonable doubt. In addition, reversal and dismissal is the appropriate remedy because 18 U.S.C. § 922(g) as interpreted and applied by the district court is unconstitutional as exceeding Congress' authority under the Commerce Clause. Finally, the case should be remanded for a retrial because the district court committed reversible error by dismissing Juror 11 on the second day of this short, two-day trial.

<u>Request For Oral Argument</u>

The Defendant respectfully requests oral argument.

22

Respectfully submitted,

October 6, 2014.


*/s/ William S. Trivette*
William S. Trivette
Attorney At Law, PLLC
North Carolina State Bar No. 21490
301 N. Elm St., Suite 308 A
Greensboro, NC 27401
Telephone: (336) 441-8054
E-mail: trivette@triad.twcbc.com

23

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-4452          Caption: United States v. Barry Dean Baize

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

(1)    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   X    This brief contains 5,422 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); or

  __    This brief uses a monospaced typeface and contains __lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

   X    This brief has been prepared in a proportionally spaced typeface using Word Perfect X6 in 14 point Times New Romantype style; or

  __    This brief has been prepared in monospaced typeface using _____ word processing program in __ font and type style.

Signed:     */s/ William S. Trivette*

Attorney
For: Barry Dean Baize

Date:        October 6, 2014

# CERTIFICATE OF SERVICE

I certify that on <u>10/6/2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert Lang
Office of the U. S. Attorney
251 Main Street
Suite 726
Winston-Salem, NC  27101
(336) 631-5268
rob.lang@usdoj.gov

/s/ William S. Trivette
_____
Signature

10/6/2014
_____
Date